# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MINNIE SMITH,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 00-894 (GK)** |
| | : | |
| **DISTRICT OF COLUMBIA,** | : | |
| ***et al.,*** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

On the evening of April 28, 1999, Tron Lindsey, an adjudicated delinquent in the legal custody of the District of Columbia government who had served a period of time at the Oak Hill Youth Center, was shot to death in his apartment by an intruder who has never been identified or apprehended.  Tron, and his roommate who was also murdered that evening, had both been moved into an "independent living" program in which they lived on their own in program-provided apartments, but were subject to restrictions and monitoring by program staff.

Ms. Minnie Smith, suing on behalf of her grandson, Tron, obtained a judgment in this case that Tron's substantive due process rights had been violated.  All phases of the appellate process have now been completed.  Pending before the Court at this time are three sets of pleadings: Plaintiff's Motion for Attorney's Fees and Non-Taxable Expenses, filed on December 29, 2003; Plaintiff's Supplemental Motion for Attorney's Fees, filed November 16, 2005; and Plaintiff's Second Supplemental Motion for Attorney's Fees, filed on August 16, 2006.  Upon consideration of the pleadings filed, the extensive record in this case, and the applicable case law, the Court concludes that the first two Motions should be **granted in part and denied in part**.  As to the third

Motion, designated as Plaintiff's Second Supplemental Motion for Attorney's Fees, it will be

**granted** in light of the statement of the District of Columbia that it "will not object" to it.[1]

## I.    INTRODUCTION

These Motions present difficult issues regarding what is fair, reasonable, and just

compensation for the legal services of very high quality lawyers who vigorously, doggedly, and

expertly represented the rights of a civil rights plaintiff who received a verdict finding the District

of Columbia liable for violations of her grandson's constitutional rights, but awarding that plaintiff

an unexpectedly modest amount of compensation.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

In Smith v. District of Columbia, 413 F.3d 86, 89-93 (D.C. Cir. 2005), Judge Tatel described

in great detail the facts surrounding Tron's murder, Tron's sad personal history reflecting the virtual

total lack of parental love, support, and guidance,[2] his involvement with the juvenile delinquency

system when he was found guilty of assault, and the manner in which the District of Columbia

provided independent living programs for older delinquent youth.  In Tron's case, he was placed in

a program run by a private contractor, ESA/Re-Direct ("ESA"), which housed the young people

assigned to it in a rental apartment complex owned by Defendant Queenstown Apartments.  Tron

was shot to death by an intruder inside his apartment in that complex.  Plaintiff sued, pursuant to 42

U.S.C. § 1983, alleging that the District of Columbia had failed to adopt standards, guidelines, or

---

[1]     Despite some confusing language in its response, at p. 1, in which it "incorporates by reference herein all of its arguments set forth" in previous filings, the Motion will be treated as conceded.

[2]     Tron's grandmother always allowed him to stay with her.  However, despite her love for Tron, her own age and physical infirmities precluded her from providing the necessary guidance and discipline that every young person needs.

procedures to safeguard those older children in the District of Columbia's custody and to ensure their safety, even though they were living in private apartments and were being supervised by social workers in an independent living program.

There was extensive pretrial litigation in this case. The District of Columbia filed motions to dismiss, to recuse this Judge, to stay the proceedings, and for summary judgment. There were discovery disputes necessitating a motion to compel by Plaintiff. There were numerous depositions and exchanges of written discovery. Finally, in March of 2003, the case went to trial and on March 27, 2003, the jury concluded that the District of Columbia and ESA were jointly and severally liable to the Plaintiff in the amount of $72,000 on both her Section 1983 and common law claims. The jury also found that neither the Defendant Queenstown Apartments nor the individual Defendant Gayle L. Turner were liable.[3]  The trial lasted 12 days and Plaintiff presented 22 witnesses, including five expert witnesses.

Defendants appealed and on July 5, 2005, a divided panel of our Court of Appeals affirmed the judgment, with Chief Judge Ginsburg dissenting. Defendant District of Columbia then sought both rehearing and rehearing en banc of the panel's decision, asserting that the case presented issues of "exceptional importance." See Petition for Rehearing and Rehearing En Banc, at 2. The Court of Appeals asked Plaintiff to respond to the petition, which she did. There was no majority in the Court of Appeals for rehearing or rehearing en banc, and the Court issued its mandate on November 1, 2005. The deadline for filing any petition for certiorari with the Supreme Court expired on

---

[3]        Earlier in the case, Plaintiff dismissed the claims against a number of individual District of Columbia Defendants in order to avoid the delay that would have resulted from interlocutory appeals by those Defendants.

January 18, 2006, with no such petition having been filed.  Thus, all litigation concerning the underlying jury verdict and judgment is complete at this time.

On December 29, 2003, after completion of the trial and entry of judgment, Plaintiff filed her first Motion for Attorney's Fees and Non-Taxable Expenses.  In that Motion, she initially identified $1,328,946.79 in billable hours and expenses, consisting of $1,027,576 for 3,303.25 hours of work performed by attorneys, $209,833.50 for 778.25 hours of work performed by paralegals and law clerks, and $91,537.29 in expenses.  Plaintiff excluded from the original calculations in her Motion any time that had been spent on unsuccessful claims that were not factually and/or legally related to those claims upon which she prevailed; this exemption included more than 700 hours of attorney time, which reduced the total to $1,248,331.79.  In addition, Plaintiff voluntarily took a further 10 percent reduction of attorney time before submitting her fee requests, and after the exclusion of those hours spent litigating claims on which she had not prevailed.  Plaintiff's initial fee award request, therefore, amounted to $1,123,498.61.  At the conclusion of the briefing on that Motion, Plaintiff again reduced her fee request by the amount of $26,400.36, of which $14,640.45 represented work performed by attorneys and $11,759.91 represented expenses.  Thus, the final amount requested by Plaintiff in her first Motion was $1,097,098.25

On November 16, 2005, after completion of the appeal process in the Court of Appeals, but prior to expiration of the time for filing a petition for certiorari with the Supreme Court, Plaintiff filed her Supplemental Motion for Attorney's Fees.  In that Motion, she initially sought an additional total amount of $186,596.86, consisting of $176,497 for work performed by attorneys and $10,099.86 in expenses.  Plaintiff used the same hourly rates derived from the 2003 Updated Laffey Matrix rates discussed, infra, that she had used in her previous filings.  At the conclusion of the

briefing on her Supplemental Motion, Plaintiff reduced her fee request by the amount of $1,984.32, consisting of a 10 percent reduction in expenses amounting to $1,007.82 and a reduction of 2.25 hours of work performed by attorneys, amounting to $976.50. Thus, the final total amount requested in Plaintiff's Supplemental Motion was $184,612.54.

On August 16, 2006, Plaintiff filed her Second Supplemental Motion for Attorney's Fees requesting an additional total amount of $23,376.45, of which $23,132.20 represented 59.2 hours of attorney/paralegal time and $256.25 in expenses. As noted earlier, the District of Columbia has not challenged the Second Supplemental Motion for Attorney's Fees.[4]

Thus, for all three filings, Plaintiff has requested a total amount of $1,305,099.25 in attorney's fees and expenses, of which $1,215,973.58 represents work performed by attorneys, paralegals, law clerks and $89,125.67 represents expenses.[5]

## III.   LEGAL ANALYSIS

Plaintiff has filed her applications for attorney's fees and expenses pursuant to 42 U.S.C. § 1988 ("§ 1988"). That provision, enacted by Congress in 1976 as the Civil Rights Attorney's Fees Awards Act of 1976, authorized the district courts to award reasonable attorney's fees to prevailing

---

[4]     There is a $12 inconsistency in the figures provided by Plaintiff. The Court leaves it to Plaintiff to straighten that matter out.

[5]     The Court realizes that preparation of attorney's fee petitions and responses thereto is not the favorite or most stimulating work assignment of most attorneys, nor is evaluating them the favorite task of this particular District Court Judge. While Plaintiff provided a great deal of information in her submissions, much of it was not presented in an internally consistent fashion or in a fashion that was easy to compare. Consequently, the Court had to spend many hours parsing out what amounts were attributable in each of the filings to hours performed by attorneys and by paralegals, and what amounts were attributable to expenses. Unless there are significant errors in the Court's calculations, it is to be hoped that everyone will simply live with any minor errors, or agree on the corrections to be made.

parties in civil rights litigation.  The seminal case on calculation of attorney's fees for prevailing

parties in such cases, pursuant to § 1988, is <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983), which

advised trial courts that "[t]he most useful starting point in determining the amount of reasonable

fees is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly

rate." 461 U.S. at 433.[6]  This figure is commonly referred to as the lodestar.  <u>Hensley</u> also set forth

other considerations that might lead "the district court to adjust that lodestar upward or downward

including the important factor of the results obtained." 461 U.S. at 434.  <u>See</u> <u>also</u> <u>City of Riverside</u>

<u>v. Rivera</u>, 477 U.S. 561, 568 (1986).

When Congress adopted § 1988, it understood that "the contingent fee arrangements that

make legal services available to many victims of personal injury would often not encourage lawyers

to accept civil rights cases which frequently involve substantial expenditures of time and effort but

produce only small monetary recoveries." <u>City of Riverside</u>, 477 U.S. at 477; <u>see</u> <u>also</u> S. Rep. #94-

1001 at 6 (1976), <u>reprinted</u> <u>in</u> 1976 USSCAN 5908-5913.  It is clear from the Section's legislative

history that Congress believed that "the public as a whole has an interest in the vindication of the

rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights

remedy to a particular plaintiff. . . ." <u>Hensley</u>, 461 U.S. at 444.  As the Supreme Court emphasized

in <u>City of Riverside</u>, "Congress expressly recognized that a plaintiff who obtains relief in a civil

rights lawsuit 'does so not for himself alone but also as a "private attorney general," vindicating a

policy that Congress considered of the highest importance.' " 477 U.S. at 575 (internal citations

---

[6]     The statute provides that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

omitted).  Keeping these principles in mind, the Court will now address the factors set forth in the governing case law to determine reasonable attorney's fees in the present action.

### A.      There Is No Dispute that Plaintiff Is a Prevailing Party

To qualify as a "prevailing party" for purposes of § 1988, <u>Hensley</u> requires that a plaintiff show success "on any significant issue in the litigation which achieves some of the benefits [she] sought in bringing the suit." <u>Hensley</u>, 461 U.S. at 433.  There is no dispute on this issue.  Defendant does not deny that Plaintiff is a prevailing party.  Given the fact that the jury found the District of Columbia and ESA jointly and severally liable for the amount of $72,000, it is clear that Plaintiff has satisfied this requirement.

### B.      The Hourly Rate Used by Plaintiff to Calculate Fees Is Reasonable

<u>Hensley</u> held that one of the two essential requirements for calculating the lodestar amount is the determination of reasonable hourly rates for the legal work performed.  In the District of Columbia, it has been traditional to apply the so-called <u>Laffey</u> Matrix which was developed more than 20 years ago in <u>Laffey v. Northwest Airlines</u>, 572 F. Supp. 354 (D.D.C. 1986), <u>aff'd in part and rev'd in part on other grounds</u>, 746 F.2d 4 (D.C. Cir. 1984).   The original <u>Laffey</u> Matrix was explicitly accepted by our Court of Appeals in <u>Save Our Cumberland Mountains v. Hodell</u>, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (<u>en banc</u>).  That 1981-82 Matrix was then updated through May 31, 1989, as part of a settlement which the parties reached and this Court accepted in <u>Salazar v. District of Columbia</u>, 123 F. Supp. 2d 8, 13 (D.D.C. 2000).

While use of the <u>Laffey</u> Matrix has been upheld by our Circuit since 1988, there are two different versions of it used as proof of prevailing market rates in federal court litigation in the District of Columbia.  One version, which is maintained by the Civil Division of the Office of the

United States Attorney ("USAO Matrix"), calculates the matrix rate for each year by adding the change in the overall cost of living, as reflected in the United States Consumer Price Index ("CPI") for the Washington, D.C. area for the prior year, and then rounding that rate to the nearest multiple of $5.  See Kohlman Decl., Ex. D to Plaintiff's Motion for Attorney's Fees and Non-Taxable Expenses.  A second, slightly different version of the Laffey Matrix ("Updated Laffey Matrix"), also in use in the Washington, D.C. area, calculates the matrix rates for each year by using "the legal services component of the CPI rather than the general CPI on which the U.S. Attorney's Office Matrix is based."  Salazar, 123 F. Supp. 2d at 14.  As the Court of Appeals noted in Covington v. District of Columbia, 57 F.3d 1101, 1109 (D.C. Cir. 1995), a plaintiff may establish previous market rates by relying on "such evidence as an updated version of the Laffey Matrix or the United States Attorney's Office Matrix. . . ."

Plaintiff in this case has calculated her hourly rates for legal services on the basis of the Updated Laffey Matrix, effective at the time that her fee application was filed in December 2003. She has used those rates throughout her submissions.  The Court concludes that the use of the updated Laffey Matrix is reasonable and consistent with previous precedent from our Court of Appeals, as well as from this Court in Salazar.  While the Updated Laffey Matrix was, as of 2003, somewhat more generous to counsel than the USAO Matrix, it was also more accurate in that the calculation was based on increases/decreases in legal services rather than increase/decreases in the entire CPI which includes price changes for many different goods and services.  Finally, it should be noted that Defendant does not challenge use of the Updated Laffey Matrix.

**C.      The Number of Hours Claimed Is Not Reasonable, Especially in Light of the Modest Jury Award**

Defendant strongly contests the reasonableness of the number of hours which Plaintiff claims in her December 2003 Motion and her November 2005 Supplemental Motion for Attorney's Fees and Expenses, and requests that the Court reduce the number of compensable hours by at least 30 percent.

Defendant makes several different challenges to the reasonableness of the number of compensable hours claimed.  First, the District of Columbia argues that Plaintiff has submitted inappropriate block billing in violation of the ruling of the Court of Appeals in <u>Role Models of America, Inc. v. Brownlee</u>, 353 F.3d 962 (D.C. Cir. 2004) ("<u>Role Models</u>").  Second, the District of Columbia argues that this litigation was grossly overstaffed, i.e., too many lawyers worked on it, they spent too much time on it, and there are many instances of duplicate and overlapping work performed by them.  Third, the District of Columbia argues that in a number of instances, lawyers performed functions which should have been performed by paralegals, and paralegals performed functions which should have been performed by clerical staff.  Fourth, the District of Columbia argues that in evaluating the reasonableness of the hours claimed, consideration must be given to the actual amount awarded by the jury.

First, as to the use of block billing, there is no question that the Court of Appeals in <u>Role Models</u> issued a stinging criticism of that practice because it "mak[es] it impossible to evaluate [the hours'] reasonableness."  353 F.3d at 971.  Plaintiff does not deny that her fee petitions do contain a certain amount of block billing.  The opinion in <u>Role Models</u>, however, must be viewed in context. It is clear from that opinion, which was unanimous, that the Court of Appeals was outraged by a fee

petition that was, by any standard, extraordinarily high.  As the Court emphasized, there was nothing

particularly complex about that case, challenging the failure of the Secretary of the Army to provide

adequate notice before disposing of a closed U.S. Army base in Maryland.  The Court noted that

"indeed, it appears just the type of garden variety administrative law matter that major Washington

law firms handle routinely."  353 F.3d at 969.  That case involved no discovery, no travel, no

evidentiary hearings, no contested facts, and no petitions for rehearing or rehearing en banc by the

losing party.  The plaintiff in that case sought $342,741.25 for more than 1,000 hours of legal work

performed, as well as $12,733.44 in expenses.  Because of such overreaching, the Court of Appeals

imposed a drastic 50 percent across-the-board reduction in the number of hours of legal work

included in the award, resulting in a total award of $83,236 which included $71,797.23 for the time

of lawyers, a law clerk, and legal assistants.

      None of the factors examined and relied upon in Role Models exist in this case.  This case

was not, by any definition, a "garden variety" case.  Section 1983 cases against municipalities are

always difficult to win.  In this case, Plaintiff had to prove to the jury, and did so prove, that the

District of Columbia had shown deliberate indifference to carrying out its responsibilities to provide

for the safety and security of young people in its custody who are trying to make the very difficult

transition into independent, adult living.

      In addition, the District of Columbia properly and competently fought Plaintiff's case at every

turn.  It filed a very substantial motion to dismiss, it sought to recuse this Judge from the

proceedings, it filed a substantial summary judgment motion, and post-trial motions.  Even after

losing the trial, and after losing before a divided panel of the Court of Appeals, it continued the battle

by filing a motion for rehearing and a motion for rehearing en banc.  Finally, discovery was

extremely significant in this case because Plaintiff had the obligation to show that the District of Columbia lacked those regulations, standards, and procedures which would have evidenced its concern about the welfare of young people in Tron's situation.  This is hardly the description of a garden variety case.  The case was fully, fairly, vigorously, and extremely professionally litigated by counsel on both sides.[7]  For these reasons, the ruling in Role Models simply cannot be blindly applied without being mindful of the factual context in which it was decided.

While there is no question that block billing does, as the Court of Appeals emphasized in Role Models, make it difficult to determine the accuracy and reasonableness of billing entries, the use of such entries in this case was not unduly excessive nor did the entries in this case, suffer from the inadequate description concerns voiced in Role Models (resulting in the 50 percent reduction already mentioned) and In Re Olson, 884 F.2d 1415 (D.C. Cir. 1989) (resulting in a 10 percent overall reduction in attorney's fees and expenses).

In examining the fee petition and evaluating the reasonableness of the hours claimed, it is essential for the trial Court to be practical and realistic about how lawyers actually operate in their day-to-day practice.  Many of the specific items that the District of Columbia claims are vague, inadequate or unclear because of block billing are of relatively minor significance.  While there is no question that lawyers should identify the project they are working on (such as a letter, a brief, consultation with co-counsel, etc.), if they have to document in great detail every quarter hour or half hour of how they spend their time on civil rights cases, two undesirable results will follow:  their fee petitions will be higher, and the lawyers will simply waste precious time doing menial clerical tasks.

---

[7]         Judge Tatel's 29-page opinion, along with the dissent of Chief Judge Ginsburg, evidence the complexity of the legal issues involved in this case.

When a lawyer writes, for example, that she spent six or eight hours in one day "researching and drafting" a brief dealing exclusively with issues on which her client has ultimately prevailed, there is certainly no need for her to itemize every case she looked up or every paragraph she labored over.  Trial courts must recognize how lawyers work and how they notate their time.  It must be remembered that the ultimate inquiry is whether the total time claimed is reasonable.  In this case, after having examined the requests, the Court concludes that sufficient detail has been provided so that it can evaluate what the lawyers were doing and the reasonableness of the number of hours spent on those tasks.  The extent of the reductions sought by the District of Columbia for the use of block billing are not justified either on their merits or by the decisions in <u>Role Models</u> and <u>Olson</u>.

Second, as to the argument of the District of Columbia that this litigation was grossly overstaffed, there is more merit.  Despite Plaintiff's good faith efforts to exercise sound billing judgment prior to the filing of its Motions, and its substantial reductions after briefing on the Motions, the Court is still forced to conclude that there was significant overstaffing and over-litigation in this case.

It is often extremely difficult to determine, and then articulate, when a case has been overstaffed.[8]  Were this case the much talked-about "tobacco case,"[9] no one would be raising an eyebrow about how many lawyers staffed it and how many thousands of billable hours were spent on it.  Unfortunately, the case law demonstrates that courts are not free to evaluate the petitions of plaintiffs' counsel in civil rights cases by the same standards that are applied in commercial litigation.  While it is essential that counsel for plaintiffs in civil rights cases exhibit a high level of

---

[8]     It may, like obscenity, be in the eye of the beholder.

[9]     <u>United States v. Philip Morris</u>, 449 F. Supp. 2d 1 (D.D.C. 2006)

competence, professionalism and vigor (all of which were provided in this case), they cannot be compensated for the kind of additional overstaffing which is routinely provided in corporate litigation.

Third, as to the argument of the District of Columbia that tasks were performed by lawyers and paralegals that should have been performed by paralegals and clerical staff, respectively, it has already been noted that Plaintiff reduced her first Motion for Attorney's Fees by the amount of $14,640.45 in response to the objections raised by the District of Columbia.  Moreover, she had already excluded more than 700 hours of attorney time, and had imposed an across-the-board percentage cut prior to filing that Motion.

The District of Columbia also argues that Plaintiff's counsel spent too much time on particular tasks.  For example, the Defendant criticizes the fact that 17.5 hours was too much time for Plaintiff's counsel to have worked on a question of appellate jurisdiction.  However, as Plaintiff explains in great detail, at pp. 17-19 of her Reply in support of her Supplemental Motion for Attorney's Fees, this was a thorny, albeit, arcane, issue which, if not handled correctly and efficiently, could have resulted in dismissal of the appeal, and then refiling and redocketing of the appeal, causing substantial delay.

The District of Columbia also argues that the time Abigail Carter, an associate lawyer, spent working on preparation of the appeal brief should have been substantially reduced because the work she performed could have been performed in far less time by Michael H. Sampson, the principal trial associate in the case who left Bredehoft & Kaiser to work at another firm.  The argument of the District of Columbia is so speculative and based on non-events, that it is simply not persuasive. Moreover, Plaintiff demonstrated that Ms. Carter, with her strong background in appellate work as

a supervising attorney in the Appellate Litigation Clinic at Georgetown Law School, was a far more appropriate person to have handled the appeal than Mr. Sampson would have been, even if he had remained at the firm.

This kind of second guessing is neither useful nor realistic in evaluating the reasonableness of hours that were actually spent by lawyers who were still employed at the law firm.  The District of Columbia also complains that hundreds of hours were spent by attorneys and paralegals preparing the fee motions.  In actuality, Plaintiff is claiming that 84 hours were spent on her original Motion and supporting brief.  Almost half of the 84 hours were spent in responding to the challenges Defendant made to virtually all the hours claimed and expenses incurred.

Fourth and finally, the most difficult issue raised by the District of Columbia is consideration of the overall fee in terms of the significance of the award.  In a very real sense, that consideration is intertwined with the judgment as to whether the number of hours claimed is reasonable.  As already noted, while the Plaintiff was totally successful in prevailing on the issue of liability, i.e., the jury found that the District of Columbia had violated Tron's due process rights, the Plaintiff achieved only a very modest success on the amount of compensation awarded.

The District of Columbia understood from the very beginning of this case that its exposure was, as a practical matter, very great.  In this Court's view, it would not have been surprising to see a jury award a million dollar or multi-million dollar verdict.  Undoubtedly, that is the main reason the District of Columbia litigated the case as aggressively as it did.  It is reasonable to infer that the Plaintiff had the same expectations of a very substantial jury award.[10]

---

[10]      The District of Columbia argues that Plaintiff's degree of success -- the award of $72,000 -- should be measured against the *ad damnum* clause in her Complaint.  That is just plain
(continued...)

In this Court's view, however, the Plaintiff grossly underestimated the hurdles she faced regarding the amount of compensation to be awarded. Tron was a young man who, because of an extremely disadvantaged childhood, had little, if any, possibility of earning substantial amounts of money over the course of his lifetime. Moreover, jurors are sophisticated and practical. There is no doubt that this jury understood that there were three possible recipients of any award: either Tron's mother, a long-time drug addict who was never in his life for any lengthy period; Tron's father, a long-time drug addict who had been totally absent from his life; or Tron's grandmother, a frail and elderly lady who demonstrated her devotion to Tron, but did not appear to have a long life expectancy.[11] Moreover, jurors also know that their awards are paid from our city treasury -- the very city treasury that their taxes support and that is obligated to provide a whole spectrum of essential municipal services, not just those for delinquent and abused children.

Plaintiff's counsel simply did not take these negative factors into account in evaluating the value of this case. Thus, while the jury's verdict of liability was truly significant in that it put the District of Columbia government on notice that it would be held legally accountable for its failure to ensure the safety of our young people in the Government's custody, its award of a mere $72,000 reflected, sadly, a not inaccurate or unrealistic evaluation of what Tron's life earnings would have amounted to.

---

[10](...continued)
foolish. *Ad damnum* requests, as all judges and litigants know, rarely bear any relationship to reality or expectations.

[11]    The Court means absolutely no disrespect to Ms. Smith by virtue of these observations.

The Court is aware that in City of Riverside, the Supreme Court "reject[ed] the proposition that the awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." 477 U.S. at 574. The Court reached this conclusion because "[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms," and "a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages award." Id. That was certainly the case here, where the jury's verdict sent a message to the District of Columbia government that it was responsible for the safety of juveniles in its custody and could not be deliberately indifferent to that obligation.

However, in a case decided six years after City of Riverside, the Supreme Court made it clear that " 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained,' " Farrar v. Hobby, 506 U.S. 103, 114 (1993), citing Hensley, 461 U.S. at 436, and overturned an award of more than $300,000 in fees and expenses because the district court ruled "without considering the relationship between the extent of the success and the amount of the fee award." 506 U.S. at 115-116, citing Hensley, 461 U.S. at 438. There is a real tension between the holdings in Farrar, City of Riverside, and Hensley, in terms of the weight which should be given to the degree of success obtained when that success necessitated the expenditure of a huge amount of lawyer and paralegal time. In this case, that relationship between an award of $72,000 and a requested award of fees and expenses of slightly more than $1.3 million simply cannot be justified; to put it in stark terms, the total fee requested is more than 18 times the monetary recovery.

Making a significant reduction in attorney's fees is always a difficult and unpleasant task. The Court of Appeals made a 50 percent reduction in Role Models when the fee request was

exorbitant in a garden variety case.  That is not the case here.  As explained earlier, this case is very different from <u>Role Models</u> and, consequently, such a reduction would be totally unwarranted.[12]  At the same time, the gap between the $72,000 award and the $1.3 million requested is so great that the Court feels compelled, after considering all the factors discussed above, and after giving much weight to the necessity of sufficiently compensating Plaintiff's counsel in a civil rights case, so as to ensure that civil rights plaintiffs will have access to highly competent counsel in the future, to reduce the amount of compensation sought for work performed by attorneys, paralegals and law clerks by 25 percent.[13]

**D.    Expenses**

In a § 1983 civil rights action, where the Plaintiff is the prevailing party as here, she is entitled to reasonable expenses.  Defendant District of Columbia raises many minor objections to the relatively modest total amount of $89,125.67 incurred over the three years covered by the December 2003 Motion for Attorney's Fees.  The Court is simply not going to engage in "nickel and diming" on this subject.  There is no question that the kind of out-of-pocket expenses claimed in this

---

[12]    The District of Columbia requested a reduction of at least 30 percent in the award requested in the first Motion for Attorney's Fees.  <u>See</u> Defendant District of Columbia's Memo of Points and Authorities in Opp. to Plaintiff's Motion for Attorney's Fees, at 5.  Despite this clear statement, Plaintiff states in its Reply Memorandum, at 10, that Defendant is seeking a reduction of hours of 65 percent.

[13]    It should be remembered that in her first Motion for Attorney's Fees, Plaintiff initially identified 3,303.25 attorney hours and 1,778.25 paralegal and law clerk hours prior to her prefiling exclusion of 700 attorney hours and 10 percent attorney fee reduction; in her Supplemental Motion for Attorney's Fees, she claimed compensation for 459.25 attorney hours and 65.75 paralegal hours; and in her Second Supplemental Motion for Attorney's Fees, she claimed compensation for 63 attorney hours and 11 paralegal hours.  Thus, Plaintiff initially identified as "hours reasonably expended" a total of 3,825.50 attorney hours and 1,855 paralegal and law clerk hours.  These were figures initially submitted to the Court before Plaintiff made any reductions in response to Defendant's Oppositions.

case, with a few exceptions, are compensable as part of an attorney's fee award.  Salazar, 123 F. Supp. 2d at 16-17.

In particular, the District of Columbia argues that expenses for computer assisted research are not compensable under § 1988.  However, our Circuit recognized in Role Models that such computer research is indeed compensable because it "save[s] money by making legal research more efficient."  353 F.3d at 975.  Defendant asked for submission of all receipts for these expenses and Plaintiff has provided them.

Role Models also ruled that expenses incurred by messenger services and ground transportation are properly excluded.  Therefore, to the extent that any such expenses are still included in Plaintiff's fee petition, they must be excluded.

After the briefing was completed on Plaintiff's Motion for Attorney's Fees and Expenses, she agreed to reduce the law firm's mark-up on computer research by $8,649.70, on long distance calls by $81.34, on postage by $63.45, and on "discrete expense adjustments" by $2,965.42.  Thus, the amount of expenses sought in her first Motion for Attorney's Fees is being reduced voluntarily by the amount of $11,759.91 (and should be further reduced by any remaining fees for messenger services and ground transportation).  Plaintiff has made analogous reductions for firm mark-up charges claimed in her Supplemental Motion for Attorney's Fees in the following amounts: $755.46 for computer research, $11.20 for long distance telephone expenses and $650 for postage, totaling $773.16.

After reviewing the papers submitted by the parties, the Court concludes that the remainder of Plaintiff's out-of-pocket expenses claimed are reasonable and reimbursable.

**CONCLUSION**

The Court expects that, after digesting this Opinion and performing the appropriate calculations it mandates, counsel will agree on the final figures and submit a proposed Order.[14]


          /s/                            
          Gladys Kessler
          United States District Judge

December ___, 2006


**Copies via ECF to all counsel of record**

---

[14]     That is not to say that by submitting such a proposed order counsel for either side is agreeing to the substance of the Court's decision.